Filed 4/3/24  P. v. White CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VERNELL WHITE,<br><br>    Defendant and Appellant. | G061707<br><br>(Super. Ct. No. 17WF2455)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Andre Manssourian, Judge.  Affirmed in part and reversed in part, with directions.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Kathryn A. Kirschbaum and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Vernell White and two accomplices committed an armed robbery of a delivery truck. At a jury trial, the prosecution introduced evidence of an uncharged home invasion robbery the same men were alleged to have participated in about three weeks earlier. The jury convicted White of kidnapping to commit robbery, carjacking, and robbery. The trial court imposed a sentence of 25 years to life, plus 10 years.

White claims: the trial court abused its discretion by admitting evidence about the prior robbery (Evid. Code, § 1101, subd. (b)); the court abused its discretion by allowing witnesses to identify him from a video of the prior robbery; the prosecutor committed misconduct by vouching for the veracity of a witness; his sentence violates the statutory multiple punishment prohibition (Pen. Code, § 654); and there were errors in the abstract of judgment and other discretionary sentencing errors.[1]

We find the trial court's challenged evidentiary rulings were not an abuse of discretion and the prosecutor did not commit misconduct. However, the trial court's section 654 ruling is ambiguous (as the Attorney General concedes). Out of an abundance of caution, we reverse White's sentence and direct the trial court to conduct a new sentencing hearing on remand. In all other respects, the judgment is affirmed.

I

FACTS AND PROCEDURAL BACKGROUND

On August 24, 2017, Miguel Z. was employed as a driver by Fox Transportation (Fox), a company that delivers medical products to pharmacies and hospitals. At about 5:00 a.m., Miguel started his day at a drug manufacturing plant loading cardboard boxes and plastic totes into a box truck. Fox drivers were not told what was in the containers. After the truck was loaded, Miguel drove to his first delivery location and then to the Huntington Beach Hospital. Miguel arrived at about 6:45 a.m.,

---

[1] Hereafter, Evidence Code section 1101, subdivision (b), will be referred to as section 1101 (b). All other undesignated statutory references are to the Penal Code.

but the hospital did not accept deliveries until 7:00 a.m., so Miguel parked the truck and waited. While Miguel was on his phone, he noticed a man (later identified as White) approach the truck with a gun in his hand. Miguel recognized the man because he had worked at Fox, but he did not know his name.

White ordered Miguel to open the driver's side door and also the passenger door. Another man with a gun (later identified as Carl DeLoach) entered through the passenger door. There were three seats in the cab; Miguel was told to sit in the middle seat. White drove the truck while DeLoach held the gun to Miguel's ribs. Miguel was told: "'Look down.'" And: "'Don't do nothing stupid.'" Video evidence later revealed the truck was being followed by a black car. White was in contact with a man on his phone (later identified as Michael Robinson). Miguel heard the voice on the phone telling White, "no no this is not a good spot, go somewhere else or something like that." The truck eventually parked in the lot of the First Samoan Congregational Church.

Miguel was ordered to get out and unlock the back door of the truck. Miguel was then ordered to climb in and sit down. While Miguel was sitting in the back of the truck, he could feel a handgun on the back of his neck. Miguel saw the black car approach the truck and noticed Robinson out of the corner of his eye. White began rifling through plastic totes in the back of the truck and pulled out gray bags, handing them to Robinson. At one point, Robinson asked, "'Where's the juice at?' or something like that." White responded, "'He doesn't know.'"

At some point, DeLoach patted down Miguel in an apparent search for his wallet (Miguel later testified that his phone, but not his wallet was taken). After about five or 10 minutes, the three men finished removing items from the truck. They told Miguel not to turn around and then locked him inside. Miguel heard the black car leave. Miguel began banging on the truck and yelling for help. Huntington Beach police officers eventually arrived.

3

*The Investigation*

A Huntington Beach police officer interviewed Miguel, who said he recognized the individual who was driving the box truck (White) as a former Fox driver, but he did not know him by name. Miguel reported the robbery to a Fox manager, J. Sanchez, who provided Miguel with copies of White's identification cards. The following day, Miguel took those copies to the police and later identified White and DeLoach in photographic lineups. Miguel said he would not be able to identify the third man (Robinson) if he saw him again; however, Miguel described him as a tall black male, weighing between 250 and 300 pounds. Robinson was six feet tall, 275 pounds.

Huntington Beach Detective Jason Burton watched a news story on television about a home invasion robbery in Calabasas. Burton noticed that two of the suspects in a video of the Calabasas robbery resembled White and DeLoach. Additionally, a car used in the Calabasas robbery looked like the black car used in the Huntington Beach robbery. Burton contacted Los Angeles Detective Anthony Valenzuela who had released the video of the Calabasas robbery to the public. A few days later, an anonymous caller identified DeLoach as one of the men involved in the Calabasas robbery.

DNA samples were obtained from the pull cord on the back of the Fox delivery truck and the door latch. The DNA matched Robinson's DNA. The suspects' cell phones were confiscated. Two days after the robbery, Robinson had searched for information about the Huntington Beach carjacking seven times. Those searches were later deleted. Robinson's search history also contained an entry that read, "'update Calabasas home invasion'" and another search for "'Calabasas robbery.'" White's phone contained communications between himself and Robinson. Robinson and DeLoach communicated via cell phone 17 times on the date of the Huntington Beach robbery.

At about 4:55 a.m., on the day of the robbery, Robinson's cell phone used a cell phone tower near the warehouse where Miguel loaded his truck. At about 6:40 a.m.,

4

White's cell phone called Robinson's cell phone using a tower near the Huntington Beach Hospital. At about 6:51 a.m., and 7:12 a.m., Robinson's cell phone called White's cell phone using a tower near the same hospital.

*Court Proceedings*

The prosecution filed an amended information charging White, Deloach, and Robinson with kidnapping to commit robbery, carjacking, and second degree robbery. As to White, the information further alleged he had two strike priors and two prior serious felony convictions. During pretrial motions, the trial court admitted evidence about the Calabasas robbery for the purpose of showing a common plan or scheme (the proffered evidence and the court's pretrial ruling is covered in detail in the discussion section of this opinion).

During the jury trial, Fox manager Sanchez positively identified White as a former employee. Another employee testified that the value of the stolen items from Fox was $7,710.29. Miguel testified White used to drive the same delivery route he was driving on the day of the robbery. Detective Burton was asked on cross-examination if he ever considered Miguel as a possible suspect. Burton said that he had, but he ruled him out. Burton agreed Miguel's demeanor immediately after the robbery was calmer than some other crime victims. Detective Valenzuela was asked on direct examination: "Is it fair to say that, in a traumatic situation, one victim might be wailing and crying and another might be completely calm?" Valenzuela responded, "Absolutely."

The jury found Robinson and White guilty of the charged crimes (Deloach had earlier pleaded guilty). White admitted the prior conviction allegations. The trial court sentenced White to concurrent terms of 25 years to life for the three crimes, plus 10 years for the two serious felony priors (the sentencing hearing is covered in greater detail in the discussion section of this opinion).

5

II

DISCUSSION

White claims:  (A) the trial court abused its discretion by admitting the section 1101 (b) evidence about the Calabasas robbery; (B) the court abused its direction by allowing officers to offer lay opinion identification testimony; (C) the prosecutor committed misconduct by vouching for a witness; (D) the sentence violates the section 654 prohibition against multiple punishments for the same crimes; and (E) there were errors in the abstract of judgment, as well as other discretionary sentencing errors.

## A.  Prior Uncharged Robbery

White argues the trial court abused its discretion by admitting evidence about the prior uncharged Calabasas home invasion robbery.  We disagree.

A trial court's ruling under section 1101 (b) is reviewed for abuse of discretion.  (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)  "'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'"  (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.)  This is a highly deferential standard of review, "'discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.'"  (*People v. Green* (1995) 34 Cal.App.4th 165, 182–183.)

In this part of the discussion, we will:  1) review relevant legal principles; 2) summarize the evidence presented to the court and its ruling under section 1101 (b); and 3) analyze the facts as applied to the law.

### 1. Legal Principles

"Except as otherwise provided by statute, all relevant evidence is admissible."  (Evid. Code, § 351.)  "'Relevant evidence' means evidence . . . having any

6

tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Ordinarily, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) However, there is no evidentiary provision that "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity . . . ) other than his or her disposition to commit such an act." (§ 1101 (b).)

"The least degree of similarity" between the charged and the uncharged conduct "is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "A greater degree of similarity is required in order to prove the existence of a common design or plan." (*Ibid.*) "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity." (*Id.* at p. 403.)

"To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 403.) "'For example, a letter written by the defendant stating he planned to commit a certain offense would be relevant evidence in a subsequent prosecution of the defendant for committing that offense.'" (*People v. Phillips* (2022) 75 Cal.App.5th 643, 665–666.) "'The existence of such a design or plan also may be proved circumstantially by evidence that the defendant has performed acts having "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations."'" (*Ibid.*)

If a trial court finds the proffered evidence relevant under section 1101 (b), it must also consider whether the potential for prejudice outweighs the probative value.

7

(See Evid. Code, § 352.)  Generally, "'[t]he probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury.'"  (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

A trial court's ruling under section 1101 (b) is reviewed based on the proffered evidence—or offer of proof—known to the court at the time of its ruling.  (See *People v. Hendrix* (2013) 214 Cal.App.4th 216, 243.)

### 2. *The Proffered Evidence and the Trial Court's Ruling*

Prior to trial, the prosecution filed a brief that included a statement of anticipated facts about the Huntington Beach robbery.  The brief also included a statement of anticipated facts about the Calabasas robbery:

"On August 6, 2017[,] a home invasion robbery was captured on video surveillance at the home where a mother and her two adult children resided.  Surveillance cameras were located inside and outside the residence.  Defendants White and DeLoach are seen walking up the driveway in orange construction vests after the mother walks outside to her vehicle and leaves for work.  Prior to leaving, the mother asked . . . White and DeLoach what they were doing, and they replied they were working on repairs in the neighborhood.  White and DeLoach are seen on video standing at the front door and [they] ring the doorbell.  The 18-year-old son was inside the home, and answered the Ring doorbell through an intercom.  He asked the men what they were doing, and the men said they work for the gas company and need to check the gas meter.  The son opened the door and was attacked by White and DeLoach.  One of the men used zip-ties on his wrists and a stun gun on his neck.  On the video, DeLoach is seen standing over the son, who is ziptied on the ground in the living room.  DeLoach is being aggressive with him, while the others ransack the house.

"A few minutes into the home invasion, the 25-year-old daughter arrives

8

home. She enters the front-door, is immediately attacked, and thrown face-down into the ground. She is dragged to the bedroom where her attacker demands to know where the safe is located. There was no safe, and she pleaded with the man to not rape her. Eventually, all three men leave the house with approximately $200,000 in jewelry, electronics, and cash. The daughter was able to make her way to a phone in the house and called 911. [¶] Defendant Robinson is not seen on surveillance footage during the home invasion, but as the investigation unfolds, it becomes clear he was part of the operation."

At a pretrial hearing, the prosecution sought to introduce the Calabasas robbery evidence under section 1101 (b). The defendants objected. After hearing arguments and reviewing the surveillance home video from the Calabasas robbery, the trial court granted the prosecution's motion: "the Court ultimately finds that, under the 1101(b) common plan or scheme rubric, there is sufficient similarity to allow the evidence from Calabasas in the trial on the Huntington Beach event."

The trial court stated there was "sufficient similarity with the roles that each person appears to play in Calabasas and in Huntington Beach." The court found, "Mr. White appears to take the lead in both events. [He] appears, from my viewing of the video from the Calabasas event, to sort of be the lead person at the door, just like he's the lead person to approach Mr. Miguel Z. [¶] DeLoach is behind him, providing muscle. [¶] And Mr. Robinson, it is alleged — though never identified in Calabasas, his telephone, the same telephone, has put him squarely in the area of the Calabasas event. And we have other evidence that puts him as the driver sort of tagging along in the Huntington Beach events."

The trial court also stated the victims were detained in both cases, and "it cannot be overlooked that a mere 18 days elapses between events. That's critical in the Court's mind, also, how close in time the two events are." The court noted: "There's a firearm alleged to be used. Unclear if it's an actual firearm or not, but there's some

9

appearance of a firearm by DeLoach in the — in the Huntington Beach event. And there's a taser used — I think by DeLoach. Was it — I can't recall who specifically used it, but it was not White. I know that. And it was not Robinson in the Calabasas event."

The trial court concluded: "So, again, I do find sufficient similarity to allow the evidence to come in not for propensity to commit the violent acts in each of the cases but under common plan or scheme."

The trial court also said, "I've also done a 352 analysis and considered the prejudicial effect, and the Court does not find that it outweighs the probative value. To the contrary, the Calabasas event is highly probative and is not outweighed by the prejudicial effect nor the undue consumption of time or the possibility of misleading the jury." The court further ruled that it would give a limiting instruction about the proper use of section 1101 (b) evidence before the Calabasas testimony and evidence was presented to the jury. (See CALCRIM No. 375.)

The limiting instruction, CALCRIM No. 375, stated, in part: "'If you decide that the defendants committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether the defendants had a plan or scheme to commit the offenses alleged in this case. [¶] 'In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. Do not consider this evidence for any other purpose except for the limited purpose of determining whether the defendants had a plan or scheme to commit the offenses alleged in this case.'"

The trial court instructed the jury on an uncharged conspiracy theory of liability, which included the following element: "One of the defendants or both or Michael Robinson or all of them committed at least one of the following overt acts to accomplish Kidnapping for Robbery, Carjacking, or Robbery, or any lesser included crime: [¶] a. White and DeLoach approached Miguel Z.'s truck [¶] b. White and DeLoach entered Miguel Z.'s truck. [¶] c. Robinson directed White to continue driving.

10

[¶] d. White, DeLoach, and Robinson arrived at the First Samoan Congregational Church.  [¶]  e. White and Robinson extracted the prescription drugs from the truck.  [¶] f. DeLoach held a gun to Miguel Z.'s body."  (CALCRIM No. 416.)

### 3. *Application and Analysis*

"It long has been established that evidence that a defendant was planning to commit a crime is admissible to prove that the defendant later committed that crime: 'The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.  A plan is not always carried out, but it is more or less likely to be carried out. . . .  There is no question about the relevancy in general of such evidence . . . .' [Citation.]  '*There is no situation in which a design to do an act would be irrelevant to show the doing of the act*.'  [Citation]  'Evidence that the defendant possessed a plan to commit the type of crime with which he or she is charged is relevant to prove the defendant employed that plan and committed the charged offense.'"  (*People v. Case* (2018) 5 Cal.5th 1, 39, italics added.)

Under a common plan or scheme analysis under section 1101 (b), "evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts." (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 403.)

Here, there were phone calls between White, DeLoach, and Robinson during the carjacking of Miguel.  White's and Robinson's cell phone activity largely tracked the movements of the Fox delivery truck as it went from where it was loaded at the warehouse to the Huntington Beach hospital.  Further, the DNA evidence found on the truck placed Robinson at the scene of the crime.  But in order to prove the elements of the conspiracy beyond a reasonable doubt to the jury—as well as the elements of each of the three crimes (kidnapping for purposes of robbery, carjacking, and robbery)—the

11

prosecution was required to prove to the jurors more than White and Robinson's identities, or their mere presence at the scene of the crime.

We find that the trial court properly found the proffered Calabasas robbery evidence (video and witness testimony) was relevant under the common plan or scheme rubric because the evidence was being offered by the prosecution for the relevant purpose of proving White and Robinson were involved in a conspiracy—a plan or scheme—to commit the crimes in Huntington Beach (kidnapping for robbery, carjacking, and robbery), and White and Robinson then "'employed that plan and committed the charged offense[s].'" (See *People v. Case*, *supra*, 5 Cal.5th at p. 39.) That is, the Calabasas robbery evidence was relevant under section 1101 (b) for the purpose of proving a common plan or scheme in both crimes. (See *Ibid.*)

Moreover, a trial court's analysis of admissibility under a common scheme or plan rubric under section 1101 (b) also properly "focuses on the manner in which the prior misconduct and the current crimes were committed, i.e., whether the defendant committed similar distinctive acts of misconduct against similar victims under similar circumstances." (*People v. Scheer* (1998) 68 Cal.App.4th 1009,1020.)

Here, the trial court analyzed the similarities between the charged Huntington Beach delivery robbery, and the uncharged Calabasas home invasion robbery. The court found it significant that White, DeLoach and Robinson had assumed similar roles during both alleged robberies. White was the lead man, DeLoach provided muscle, and Robinson acted as the driver. The court also found other factors to be important: that the same phones were used in both incidents; a physical detention of the victims similarly occurred in both cases; a weapon was used in both cases; and the Calabasas robbery preceded the Huntington Beach robbery by only 18 days.

It is apparent that the trial court compared the uncharged Calabasas and charged Huntington Beach robberies and then made a reasoned decision according to the proffered facts and the relevant legal principles. That is, the court reasonably found the

12

Calabasas evidence was relevant for the purposes of proving a common plan or scheme in the Huntington Beach robbery, and the court also focused its analysis under section 1101 (b) "on the manner in which the prior misconduct and the current crimes were committed." (See *People v. Scheer*, *supra*, 68 Cal.App.4th at p. 1020.) Further, the court weighed the probative value of the evidence as it was required to do. (Evid. Code, § 352.) Indeed, the court took additional steps to limit the possible prejudicial impact of the Calabasas evidence by electing to read the applicable limiting instruction to the jury at multiple points during the trial. (See CALCRIM No. 375.)

In sum, we find the court was not arbitrary or capricious when it admitted the Calabasas evidence under section 1101 (b) for the limited purpose of proving a common plan or scheme. (See *People v. Foster*, *supra*, 50 Cal.4th at pp. 1328–1329.)

White argues the trial court erred when it admitted evidence about the uncharged Calabasas robbery because it "lacked sufficient similarity" to the charged Huntington Beach robbery. White points out some of the factual differences between the two robberies. For instance, White argues: "One involved a truck and controlled substances; the other a house and its valuables." White also notes that there was an additional person involved in the Calabasas robbery who was apparently not involved in the Huntington Beach robbery.

White is correct that there are factual differences between the two crimes, but there are also similarities as noted by the trial court, particularly as to the manner in which the crimes were committed, or the similar roles of White, DeLoach, and Robinson during both crimes. But under the deferential abuse of discretion standard of review, we cannot reweigh the evidence. The more pertinent question for this court is whether the trial court was arbitrary and/or capricious in its ruling. And although perhaps a different judge would have made a different decision based on the same facts, we cannot say that the court's ruling was outside the limits of acceptable judgment. (See *People v. Carmony* (2004) 33 Cal.4th 367, 377 ["a trial court does not abuse its discretion unless its decision

13

is so irrational or arbitrary that no reasonable person could agree with it"].)

White also argues the Calabasas robbery evidence was prejudicial as compared to the Huntington Beach robbery. (See Evid. Code, § 352.) We disagree.

"Evidence is not prejudicial, as that term is used in [an Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant." (*People v. Doolin* (2009) 45 Cal.4th 390, 438.) """"The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging.""""" (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.)

Here, the relevant facts about the Calabasas robbery, which were made known to the trial court at the time of its section 1101 (b) ruling, were that an 18-year-old man was ziptied in his home after he "opened the door and was attacked by White and DeLoach." Further, his 25-year-old sister was attacked after she entered the home during the robbery and was "thrown face-down into the ground." While these facts are certainly reprehensible, they do not appear to involve substantially more inflammatory conduct than the violence committed against Miguel. Moreover, the trial court repeatedly instructed the jury regarding the limited purpose of the Calabasas evidence (to show a common plan or scheme in both robberies). (See § 1101 (b).)

In any event, even if we were to find that the trial court's admission of the Calabasas robbery evidence constituted an abuse of discretion, we would not find it reasonably likely that an outcome more favorable to White would have resulted had the section 1101 (b) evidence not been admitted. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Clark* (2021) 62 Cal.App.5th 939, 968 [the state law error test is applied to the analysis of an alleged error under section 1101 (b)].)

Miguel identified White as a Fox driver immediately after the robbery, as

14

well as positively identifying him in a photographic lineup and during the trial. And the Fox manager, Sanchez, positively identified White and confirmed that White was a former Fox driver. Miguel also testified that Fox drivers did not have knowledge of what kind of drugs were in each container. Consistent with that testimony, when Robinson asked during the course of the robbery, "'Where's the juice at?' or something like that." White responded, "'He doesn't know.'" That is, there was evidence that this was a well-planned and coordinated crime based on White's knowledge of the inner workings of Fox's medical delivery business.

Moreover, other relevant evidence showed Robinson's cell phone was in contact with both White and DeLoach's phones during the instant crimes. Cell phone tower records also placed Robinson and White's cell phones near the warehouse where Miguel loaded the truck and near the Huntington Beach Hospital, where the carjacking initially started. And during the time White was driving the delivery truck, Miguel testified he could hear White being told by the driver of the car (Robinson), "no no this is not a good spot, go somewhere else or something like that."

To reiterate and conclude, given the overwhelming evidence supporting White's guilt in the charged crimes, we find it is <u>not</u> reasonably probable that had the uncharged Calabasas robbery evidence *not* been admitted a result more favorable to him would have occurred. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## B. Identification Testimony

White claims the trial court committed an evidentiary error by allowing three law enforcement officers to identify him during the trial based on surveillance video and audio from the Calabasas home invasion robbery. We disagree.

We review a trial court's ruling on the admission of lay opinion identification testimony for abuse of discretion. (*People v. Leon* (2015) 61 Cal.4th 569, 600 (*Leon*).) We will not disturb such a ruling "'except on a showing the trial court

15

exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Pineda* (2022) 13 Cal.5th 186, 222.)

In this part of the discussion, we will: 1) review relevant legal principles; 2) summarize the evidence presented to the trial court and its ruling; and 3) analyze the facts as applied to the law.

### 1. Legal Principles

"A verdict or finding shall not be . . . reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.)

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (Evid. Code, § 800.)

A testifying witness who did not actually witness a crime may identify a defendant from photographs and surveillance video if the lay witness has prior personal knowledge of the defendant and the testimony will assist the trier of fact. (*People v. Perry* (1976) 60 Cal.App.3d 608, 612 ["the identity of a person is a proper subject of nonexpert opinion"].) The question of the degree of personal knowledge goes to the weight, rather than to the admissibility of the lay witness opinion. (*Id*. at p. 613.)

A police officer who is familiar with a defendant may offer a lay opinion identifying the defendant based on a robbery surveillance video. (*Leon*, *supra*, 61 Cal.4th at p. 600.) In *Leon*, defendant committed several armed robberies in which he killed two

store clerks. (*Id*. at p. 576.) During a jury trial, a police detective was shown surveillance videos from two of the robberies. The detective "testified that he was 'very' familiar with defendant's appearance. He first saw defendant when he was arrested. He subsequently saw defendant nearly 10 times and spent about two hours with him." (*Id*. at p. 600.) The detective "was also familiar with the jacket defendant wore when arrested." (*Ibid*.) The detective opined the robber in both of the videos was defendant, and the jacket he was wearing in the videos was similar to the jacket he wore when he was arrested. (*Id*. a pp. 600–601.) In a direct appeal to the Supreme Court, defendant argued the trial court abused its discretion by admitting the detective's identification testimony as a lay opinion. (*Id*. at p. 600.) The Supreme Court disagreed. (*Ibid*.)

In *Leon*, the Supreme Court cited three lower court opinions, noting: "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Leon*, *supra*, 61 Cal.4th at p. 601.) Defendant sought to distinguish the three opinions because in each of those cases the testifying witnesses who identified the defendants had prior contacts with those defendants "*before* the crimes." (*Ibid*.) The Supreme Court rejected that analysis, finding that: "This is a distinction without a difference. It is undisputed [the detective] was familiar with defendant's appearance *around the time of the crimes*. Their contact began when defendant was arrested, one day after [one of the robberies]. Questions about the extent of [the detective's] familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony." (*Ibid*., italics added.)

### 2. Trial Court Proceedings

In an earlier jury trial (a mistrial), the prosecution had introduced video evidence from the Calabasas home invasion robbery. In that trial, Huntington Beach Detective Burton, and White's probation officer, Officer David Beaupre, had each opined that a man's voice heard in the Calabasas video was White's voice. Prior to the start of

the instant trial, White filed a motion seeking to exclude Burton and Beaupre's lay opinion testimony identifying White's voice.

At a pretrial hearing on the motion, White's counsel acknowledged the Supreme Court's holding in *Leon*, and admitted "the case law is not favorable." Counsel stated, "so I understand that [Detective Burton and Officer Beaupre's testimony is] going to come in. My thought was that we could just have a limiting instruction maybe for the first officer, saying just that, you know, this officer's opinion that it's this person is a lay opinion; it is not an expert opinion."

The trial court told counsel, "Well, so your motion, first of all, as you can imagine, is going to be denied. And I'm really not even inclined to give a limiting instruction because, if I recall from the first trial, it sort of did come in as a lay opinion. There was no air of it being an expert opinion. It was based on his memory and knowledge of what Mr. White sounds like, if I recall it correctly." After inquiring of the prosecutor, the court said: "I think it was pretty obviously a lay opinion. I don't think there's a need to give a limiting instruction."

During the trial, Officer Beaupre testified he met White about six months before the Calabasas robbery and spoke to him on the phone about two to four times a month. After viewing the Calabasas video in court, Beaupre recognized White based on his body type and also that "his voice was very distinct." Detective Burton viewed the video and recognized White: "Because I sat in an interview with him for an hour and a half and spoke to him, and I recognize him in that video from the way he looks and the way he speaks." Los Angeles Detective Valenzuela viewed the video and recognized White: "Based off of the video, it's his . . . stature, his tone and voice that I had over an hour to talk with him. I think the video speaks very clearly . . . it's my opinion that is Mr. Vernell White."

18

### 3. *Application and Analysis*

Prior to the pretrial hearing, White argued: "Detective Burton and Probation Officer Beaupre lack foundation to testify that [White's] voice matches the Calabasas robbery suspect." (Boldfacing & underling omitted.) We disagree.

Detective Burton testified he talked to White for about an hour and a half after he was arrested. Officer Beaupre testified he spoke to White two to four times a month in the months prior to the Calabasas robbery. Consistent with the Supreme Court's holding in *Leon*, evidence about the extent of the two witnesses' familiarity with White's voice "went to the weight, not the admissibility, of [their] testimony." (*Leon*, *supra*, 61 Cal.4th at p. 601.) Thus, we find the trial court did not abuse its discretion when it overruled White's objection and admitted the challenged testimony.

For the first time on appeal, White challenges the admission of the Los Angeles detective's testimony (Valenzuela). White also for the first time on appeal challenges the admission of Burton's and Beaupre's testimony on the grounds that they recognized him in the Calabasas video based on his appearance (rather than his voice). These challenges have been forfeited for purposes of appeal because they were not raised in the trial court. (See Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 434–435 [an evidentiary objection made on one ground in a trial court does not preserve a challenge based upon a different ground in an appellate court].)

In any event, White's evidentiary challenge fails on the merits. As trial counsel seemed to recognize, *Leon* is directly on point. (*Leon*, *supra*, 61 Cal.4th at p. 601.) All three officers who testified were familiar with White's appearance at or near the time of the Calabasas robbery; therefore we must follow the Supreme Court's holding in *Leon*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction"].) We are not going to address White's numerous citations to lower federal courts as they are not

19

binding on this court. (See *People v. Avena* (1996) 13 Cal.4th 394, 431 ["'we are not bound by decisions of the lower federal courts, even on federal questions'"].)

And once again, even if we were to find evidentiary error, we would not find it to be prejudicial. (See *People v. Watson, supra,* 46 Cal.2d at p. 836.) As we discussed earlier, Miguel positively identified White, who was a former Fox driver (along with other overwhelming evidence). (See Discussion, part A3, *ante*.)

## C. Prosecutorial Misconduct or Error

White claims the trial court erred when it overruled his objection that the prosecutor was vouching for a witness during his closing argument. We disagree.

"As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) Under this standard of review, "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 377.)

In this part of the discussion, we will: 1) review relevant legal principles regarding prosecutorial misconduct (or prosecutorial error); 2) summarize the trial court proceedings; and 3) apply the facts to the law.

### 1. Relevant Legal Principles

We evaluate claims of prosecutorial misconduct under well-established standards. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

Generally, in order to raise an alleged error on appeal, the issue must have first been raised in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 & fn. 2.) Specifically, a defendant forfeits a prosecutorial misconduct claim on appeal unless the defendant objected to the alleged misconduct when it occurred, and further asked the court to admonish the jury. (See *People v. Ervine* (2009) 47 Cal.4th 745, 806.)

"'A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.'" (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.) However, "'the term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

In reviewing a prosecutor's comments to the jury, "we must view the statements in the context of the argument as a whole." (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) Generally, a prosecutor has "'wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.'" (*Ibid*.) The relevant question is "'whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*Id.* at pp. 1202–1203.)

A prosecutor cannot vouch for the credibility of its witnesses, or otherwise attempt to bolster the veracity of a witness's testimony, by referring to evidence outside of the record. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 561.) A prosecutor is not permitted to offer the impression that he or she may have knowledge outside of the record that assures a witness's truthfulness at trial. (*People v. Ward* (2005) 36 Cal.4th 186, 215.) However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of a witness is based on the facts contained in the "record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,"

21

then any such supported arguments about a witness' veracity by the prosecutor cannot be characterized as improper vouching. (*People v. Medina* (1995) 11 Cal.4th 694, 757.)

"""It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.""" (*People v. Williams* (1997) 16 Cal.4th 153, 221.) """It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.""" (*Ibid*.)

### 2. Trial Court Proceedings

In closing, the prosecutor argued: "Now, Miguel was in real fear during this. I anticipate the Defense will say, 'Oh, Miguel was very calm. You know, when he was telling the officers what happened, he was very calm.' People have different ways of processing trauma, of processing stress. If you've ever dealt with something like a death in the family -- I'm sure everybody has. I know I have. You might have, like my sister, totally bawling, wailing. Too much stress. She can't handle it."

Robinson's attorney interposed: "Objection. Counsel's vouching." The trial court overruled the objection.

The prosecutor continued: "Might have another sibling go to work the next day, try to act like nothing happened. People have different ways of processing stressful moments, and you can understand that. But Miguel told you honestly that he was just hoping nothing would happen to him. That was his main concern. He thought they were going to kill him. 'It's pretty stupid to leave me alive. That's what I was thinking,' because he knows -- he's seen Vernell White before. In fact, the next day, Miguel went to the police station, said, 'This is the guy. Here's his ID and social security number. I know this guy from my work. I've actually seen him before. We've said "hello" in passing. I've heard him talk to other coworkers. I know he used to be the guy who

22

worked at Fox Transportation. In fact, he used to be the guy who drove this same route that I drove the morning of August 24.'"

### 3. Analysis and Application

White argues in his opening brief: "Here, in telling the jury that people have different ways of processing trauma, like a death in the family, that [the prosecutor] had experienced this too, and that Miguel told you 'honestly' what he was thinking [citation], the prosecutor committed misconduct, violating appellant's constitutional right to a fair trial." We disagree.

The prosecutor's comments about how different people in his family process trauma differently was presumably brought up as a prebuttal to a possible defense theory that the robbery was an inside job and Miguel was involved because he apparently was relatively calm when he initially spoke to the police. Understood in context, the prosecutor's argument about trauma appeared to be offered as an example """drawn from common experience.""" (*People v. Williams, supra,* 16 Cal.4th at p. 221.)

Thus, we find the trial court did <u>not</u> abuse its discretion when it overruled the defense objection during closing argument.

As far as the purported vouching for Miguel's veracity, this issue has been forfeited on appeal because it was not timely raised in the trial court (and a curative instruction was not requested). (See *People v. Ervine, supra,* 47 Cal.4th at p. 806.)

In any event, the prosecutor mentioned Miguel's statements about his fear of likely being killed due to Miguel's testimony about his prior acquaintanceship with White. That is, the prosecutor's argument appeared to grounded on the facts contained in the "record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief" on the part of the prosecutor. (*People v. Medina, supra,* 11 Cal.4th at p. 757.) White argues *People v. Rodriguez* (2020) 9 Cal.5th 474 (*Rodriguez*), compels a different result. We disagree.

23

In *Rodriguez*, a jury convicted a defendant of two counts of assault with a deadly weapon by a prison inmate. (*Rodriguez*, *supra*, 9 Cal.5th at p. 479.) The jury had listened to the testimony of two corrections officers. (*Id*. at pp. 478–479.) During closing argument, the prosecutor said, in part: "'So, you are being asked to believe . . . that Officer Stephens, an officer, I think, with 17 years of experience . . . , for some reason, would put his entire career on the line. He would take the stand, subject himself to possible prosecution for perjury and lie and make up some story . . . .'" (*Id*. at p. 479.) The prosecutor also argued Officer Lowder had, "'a long career. His was over 20 years. So we're supposed to believe that, for some reason, Officer Lowder would put his entire career . . . at risk, subject himself to possible prosecution for perjury . . . .'" (*Ibid*.)

In *Rodriguez*, the California Supreme Court found, "the prosecutor's arguments that the officers would not lie because each would not put his 'entire career on the line' or 'at risk' constitute impermissible vouching. The prosecutor's career-related arguments 'convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury.' [Citation.] The record here does not contain any direct or circumstantial evidence about whether the officers 'would put' their 'entire career on the line' or 'at risk' by giving false testimony. The officers did testify that they had served for 17 and 20 years, but the length of an officer's career does not supply evidence that the officer would risk the most severe career penalty (being fired) for testifying falsely. The prosecutor's arguments on these topics are thus based upon matters outside the record that were not subject to cross-examination." (*Rodriguez*, *supra*, 9 Cal.5th at p. 481.)

In this case, the transcripts of Miguel's initial police interviews were entered into evidence. During one of those interviews, an officer asked Miguel what he was thinking as the carjacking was taking place. Miguel said, "I was just hoping nothing would happen to me pretty much [¶] . . . [¶] that was my main concern[.]" The officer

24

asked Miguel, "Right so you're scared they would do something to you?" Miguel responded, "Yeah cause . . . especially that one guy who I saw at work like it's pretty stupid to leave me alive or something like that." During the trial, the prosecutor asked Miguel, "Why did you comply with their orders?" He responded, "So they wouldn't do nothing to me." The prosecutor asked, "Were you scared?" Miguel responded, "Yes."

During closing argument, the prosecutor argued, "Miguel told you *honestly* that he was just hoping nothing would happen to him. That was his main concern. He thought they were going to kill him. 'It's pretty stupid to leave me alive. That's what I was thinking,' because he knows -- he's seen Vernell White before." (Italics added.)

Therefore, unlike the witnesses' testimony in *Rodriguez*, the prosecutor's arguments about Miguel's testimony were based on matters included in the record (the transcript of his interview and his trial testimony) and were therefore subject to cross-examination. (Compare *Rodriguez*, *supra*, 9 Cal.5th at p. 481.) Thus, the prosecutor's argument did not constitute misconduct or error.

And once again, even if we were to find prosecutorial misconduct (error), we would not find the error to be prejudicial. (See Discussion, part A3, *ante*.)

## D. Multiple Punishment Prohibition

White argues his "sentence violates Penal Code section 654. . . . The kidnapping and carjacking were incidental to the single objective which was to steal the controlled substances from the truck." The Attorney General responds that "given the ambiguity in the trial court's remarks concerning the applicability of section 654, respondent has no objection to a remand of the matter . . . ." We agree with this proposed disposition as suggested by the Attorney General.[2]

"An act or omission that is punishable in different ways by different

_____

[2] The Attorney General also alternatively argues "there were separate acts and objectives involved in the kidnapping and the robbery."

25

provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654.) Section 654 seeks to prevent multiple punishments for same act or omission by requiring a trial court to stay the execution of a defendant's sentence on all but one of those convictions. (*People v. Alfred* (2010) 180 Cal.App.4th 1463, 1466.)

Section 654 may be applicable in cases where multiple statutory violations arise from a single act or course of conduct. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252.) To determine whether a course of criminal conduct is comprised of separate divisible acts, courts examine "the intent and objective of the actor." (*Neal v. State of California* (1960) 55 Cal.2d 11, 22, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331, 334, 344.) If all of the offenses were incident to one objective, the defendant generally may be punished for only such offense. (*Neal*, at p. 19.)

The trial court has "broad latitude" to determine whether section 654 is factually applicable to a series of offenses. (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.) After making a factual determination under section 654, the court must ordinarily make a further discretionary determination as to whether a defendant's prison terms for multiple crimes "shall run concurrently or consecutively." (§ 669, subd. (a).)

"*Before determining* whether to impose either concurrent or consecutive sentences on all counts on which the defendant was convicted, the court *must determine* whether the proscription in section 654 against multiple punishments for the same act or omission requires a stay of execution of the sentence imposed on some of the counts. If a stay of execution is required due to the prohibition against multiple punishments for the same act, *the court has discretion* to choose which act or omission will be punished and which will be stayed." (Cal. Rules of Court, rule 4.424, italics added.)

The jury convicted White (and Robinson) of kidnapping to commit robbery (count one), carjacking (count two), and robbery (count three). At sentencing, White's counsel argued as to section 654 that the three crimes were part of "one course of

26

conduct. It is one scheme." The trial court ruled:

"Understood. I think *you are to some extent correct*, but the reason I make an issue out of it now is twofold: One, I think it's -- it's important to note what the maximum possible sentence could be. And if these counts do not 654, then 85 to life is what the Court thinks the maximum possible sentence could be. [¶] Also, the reason the topic is important to the Court is because I can envision a day when this case and Mr. Robinson's case are back in front of us for a resentencing.

"So what I'm going to find is that the counts do not 654 with each other and that, if the Court wanted to, it could consecutively sentence on Counts 2 and Count 3. I think that's noteworthy. Again, in the event that I'm in a position where I have to resentence Mr. White, I may very well avail myself of the opportunity to sentence consecutively. [¶] As it stands, whereas I do think the law would allow this Court to sentence consecutively on Counts 2 and 3, I choose not to in the interest of justice. But as far as this Court is concerned, that's all the remark I want to make on the 654 issue."

Later in the sentencing hearing, the trial court said: "I'm also aware of my ability to sentence on a different count if they do 654. If Counts 1, 2, and 3 654, I'm aware that I wouldn't have to necessarily sentence him to the life term in Count 1. The Court would have the discretion and the ability to sentence on Count 2, the carjacking. Or if it 654s as well, Count 3, the robbery charge. But I'm choosing not to do so. Again, based on the seriousness of the crimes in this case."

The trial court then sentenced White to 25 years to life for count one, 25 years to life for count two (concurrent to count one), and 25 years to life for count three (concurrent to counts one and two). The court then added an additional 10 years for the two serious felony priors.

Under the applicable sentencing rules, the trial court was first required to make a factual determination under section 654, *and then to decide* whether to run White's life terms either concurrently or consecutively. That is, the court was first

27

required to determine whether the three crimes each had separate intents or objectives, or whether they were part of a continuous course of conduct. (See *People v. DeVaughn*, *supra*, 227 Cal.App.4th at p. 1113.) The court's section 654 ruling is frankly difficult to decipher; however, it does appear that the court first decided to run White's sentences concurrently, and then to reserve its section 654 factual ruling to some later point in time in the event there was a resentencing hearing. In short, it appears the court failed to comply with the mandatory sentencing procedures. (See Cal. Rules of Court, rule 4.424.)

We find it unlikely that the trial court's ambiguity will affect the length of White's prison term; however, out of an abundance of caution, we have decided it is appropriate to vacate the sentence and remand the matter, so the court can make clear its section 654 ruling. (See *People v. Braxton* (2004) 34 Cal.4th 798, 818–819 ["remand is appropriate . . . to allow the trial court to resolve one or more factual issues affecting the validity of the judgment but distinct from the issues submitted to the jury"].)[3]

## E. *The Abstract of Judgment and Other Alleged Sentencing Errors*

White argues the abstract of judgment does not accurately reflect his sentence as well as his custody credits, and the court abused its discretion when it denied his motion inviting the court to dismiss his strikes and prior serious felony convictions. (See *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.)

Because we are remanding the case for a new sentencing hearing, the trial court is directed to amend the abstract of judgment as needed. At the sentencing hearing, the court may "'reconsider all of its sentencing choices, subject only to the limitation that defendant not be sentenced to a greater aggregate term than the first sentence.'" (*People v. Kelly* (1999) 72 Cal.App.4th 842, 845.)

---

[3] The trial court made a similarly ambiguous section 654 ruling at Robinson's sentencing hearing. In that case, we also vacated Robinson's sentence and remanded the matter for a new sentencing hearing. (*People v. Robinson* (Sept. 13, 2023, G061689) [nonpub. opn.].)

28

Consequently, we need not address White's remaining claims of sentencing errors because some of them may become moot. White will have the right to file another appeal following his resentencing. (See *People v. Arias* (2020) 52 Cal.App.5th 213, 219–221 [a newly imposed sentence following resentencing constitutes an appealable "'final judgment of conviction' under section 1237, subdivision (a)"].)

III

DISPOSITION

We reverse White's sentence. We direct the trial court to conduct a new sentencing hearing on remand and to make an appropriate ruling under section 654. We further direct the court to modify the abstract of judgment as needed and to send a certified copy to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.

29